UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CAREY BRABSON,                        Case No. 1:11-cv-399

      Plaintiff,

                                         Judge Timothy S. Black

vs.

STATE OF OHIO, SOUTHERN OHIO
CORRECTIONAL FACILITY,

      Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 16)**

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 16) and the parties' responsive memoranda (Docs. 20, 22).

## I.     BACKGROUND FACTS

This is a Title VII action filed by Carey Brabson, a former Mental Health Secretary at the Southern Ohio Correctional Facility ("SOCF") of the Ohio Department of Rehabilitation and Correction ("ODRC"). Plaintiff alleges sexual harassment, sex discrimination, and retaliation arising from her employment with ODRC. Specifically, Plaintiff claims that Al Lewis, a former investigator at SOCF, subjected her to sexual comments and propositioned her for a period of four or five months in 2007. Plaintiff also claims that Lewis retaliated against her and her husband, Nick Brabson, another SOCF employee, for failing to accept Lewis's sexual advances and for turning over evidence in an unrelated investigation of Lewis. Plaintiff also alleges that SOCF failed to take action to prevent and correct Lewis's behavior.

SOCF moves for summary judgment as to Claim One (sexual harassment, sex discrimination, and hostile work environment based on retaliation), the only count of the Complaint which remains pending.[1] (Doc. 9 at ¶ 9).

## II. UNDISPUTED FACTS[2]

1. Carey Brabson began her career in law enforcement in November 1993 at the Scioto County Sheriff's Department ("SCSD") as a 911 dispatcher and attendant to female inmates. (Doc. 15 at 34).

2. As a 911 operator, she dispatched Al Lewis, a deputy with the SCSD K-9 road unit, to various locations where assistance was needed. (Doc. 15 at 35-36).

3. In her role as 911 operator, Brabson had an opportunity to observe Lewis's work performance and admired his commitment to the K-9 program. (Doc. 15 at 36).

4. Brabson and Lewis were co-workers. (Doc. 20, Ex. 1 at ¶ 11).

5. In March 1997, Brabson left SCSD and began working for ODRC as a corrections officer at Pickaway Correctional Institution ("PCI") in Orient, Ohio. (Doc. 15 at 33).

6. Several times during her employment with DRC, Brabson was informed of the sexual harassment and anti-discrimination policies and received EEO training. (Doc. 15 at 43-44, Ex. 5).

7. Finding that PCI was too far from her home, Brabson put in for a lateral transfer to SOCF which was granted in September 2000. (Doc. 15 at 33).

8. At the time of her transfer request, Lewis was working as an investigator for SOCF and Brabson called him to check into the status of her pending transfer. (Doc. 15 at 39-40).

---

[1] Plaintiff originally asserted three claims against Lewis and SOCF in her Complaint. This Court dismissed all claims against Lewis and Claims two and three against SOCF. (Doc. 6).

[2] (*See* Docs. 17, 21).

9. Because of a delay in processing her application for transfer, Brabson took a voluntary demotion and accepted an office assistant position. (Doc. 15 at 34).

10. As an office assistant, Brabson had little contact with Lewis and had no reason to interact with him professionally. (Doc. 15 at 40-41).

11. However, that changed after Brabson was promoted to Mental Health Secretary in 2004. (Doc. 15 at 42).

12. As Mental Health Secretary, Brabson would see Lewis more often in the institution corridors. (Doc. 15 at 41-42).

13. Brabson and Lewis would often talk about their mutual acquaintances at the sheriff's department. (Doc. 20, Ex. 1 at ¶ 11).

14. In 2007, Brabson was dealing with a personal financial crisis and, as the result of her husband's actions, the Brabsons faced foreclosure on their home and repossession of their vehicles. (Doc. 15 at 54-55, 91-92).

15. In April 2007, while chatting with her sister-in-law Jenny Hayward and Lewis, Brabson received a telephone call regarding these financial issues. (Doc. 15 at 50, 91-92).

16. Brabson excused herself to take the call, and when she returned to the table, she discussed her financial situation with Hayward and Lewis interjected himself into the conversation. (Doc. 20, Ex. 1 at ¶¶ 11, 12).

17. Sometime during the next week, Lewis stopped by Brabson's office to check on her. (Doc. 15 at 56-57).

18. Brabson expressed how frustrated she was to Lewis. (Doc. 20, Ex. 1 at ¶ 15).

19. Lewis asked the same questions that her family had been asking - "what did he do with the money?" and "is he gambling?" and lent his support to her by expressing disgust and putting the blame on her husband. (Doc. 15 at 57).

20. Lewis left $50 in Brabson's office. (Doc. 20, Ex. 1 at ¶¶ 13, 14).

23. During early May 2007, Brabson and her coworker, Melissa Ervin, shared a supervisor, Dirk Prise. (Doc. 16, Ex. 2 at ¶ 2).

24. Evrin approached Prise and proposed a hypothetical about an administrative staff member who was pressuring an employee to date him. (Doc. 16, Ex. 2 at ¶ 2).

25. Prise guessed that Ervin was speaking of Brabson and Lewis and soon called Brabson into his office. (Doc. 16, Ex. 2 at ¶ 2).

26. Brabson told Prise that Lewis was trying to get her to go out with him. (Doc. 16, Ex. 2 at ¶ 3).

27. Prise wrote up a report of the incident and told Brabson that no one was above the rules. (Doc. 20, Ex. 1 at ¶ 22).

28. Brabson begged Prise not to file a formal complaint and stated that she wanted to remedy the situation herself. (Doc. 20, Ex. 1 at ¶¶ 22-24).

29. Prise agreed, stating that if he heard of any other problems with Lewis, he would immediately turn in the report. (Doc. 20, Ex. 1 at ¶¶ 22-24).

31. After her office was moved, Brabson never complained to Prise about Lewis, and Lewis's visits reduced and then stopped. (Doc. 15 at 84-85).

32. In 2009, ODRC launched a statewide investigation into the inappropriate use of email and utilized Lewis as one of its investigators. (Doc. 15 at 101, Ex. 10; Doc. 16, Ex. 1 at ¶ 6).

33. As an investigator, Lewis often investigated alleged misconduct of employees at the prison, which often led to the discipline or termination of SOCF employees. (Doc. 16, Ex. 1 at ¶ 3).[3]

36. The Warden decided that the network administrator and not Brabson would be disciplined. (Doc. 16, Ex. 1 at ¶ 6).[4]

37. As the investigation into the unauthorized email use progressed, numerous SOCF employees were implicated. (Doc. 16, Ex. 1 at ¶ 7).

---

[3] Defendant alleges that during the email investigation, it was suggested that an SOCF network administrator, Tom Williams, warned Brabson about the investigation and Brabson was telling others how to disable and delete emails in order to avoid discipline. Plaintiff denies this allegation.

[4] Plaintiff claims that she was never made aware of any such decision. (Doc. 21).

38. One of those ultimately disciplined was Brabson's husband, Nick Brabson, who was given a two-day suspension by then-Warden Kerns for sending racial and sexual-themed emails. (Doc. 15 at 102-103, Ex. 10).[5]

39. After Mr. Brabson was disciplined, he turned over seven non-work related emails sent by Lewis to Brabson and reported Lewis' conduct toward Brabson to the Union president and vice president. (Doc. 15 at 106-107, Ex. 9).

40. All of the personal e-mails from Lewis to Brabson were chain e-mails, and were widely-circulated in the institution. (Doc. 16, Ex. 1 at ¶ 8).

41. At no time did Ms. Brabson ask Lewis to stop sending her email forwards. (Doc. 16, Ex. 1 at ¶ 8).

45. Lewis showed Brabson and another corrections officer a crime scene picture of what appeared to be a dead woman gagged in the trunk of a car, but told them that the murder was not real and was part of the murder-for-hire sting operation. (Doc. 15 at 109; Doc. 16, Ex. 1 at ¶ 9).[6]

46. After her husband reported Lewis' alleged 2007 harassment in December 2009, Brabson attended a meeting with then-Warden Kerns, another SOCF investigator, and Kerns' assistant. (Doc. 15 at 45, 121).

49. By the time Brabson complained to the Warden, Lewis was out on administrative leave pending the OHSP investigation. (Doc. 15 at 82-83; Doc. 16, Ex. 1 at ¶ 10).[7]

52. Later in February 2010, Brabson began taking disability leave for an injury to her ankle. (Doc. 15, Ex. 1 at 11).

---

[5] However, the emails for which Nick Brabson was disciplined were chain e-mails, which were widely-circulated in the institution, and were not sent to any female employees. (Doc. 20, Ex. 1 at ¶¶ 33, 34).

[6] Plaintiff admits that Lewis showed her a crime scene picture, but claims that he did not mention the murder-for-hire operation until another corrections officer arrived and saw the pictures. (Doc. 20, Ex. 1 at ¶¶ 34-37).

[7] Plaintiff admits that by the time she was interviewed by the Warden, Lewis was out on administrative leave, but denies that Lewis was on leave when the Warden was first made aware of her complaints. (Doc. 20, Ex. 1 at ¶¶ 30, 39, 40).

53. Brabson continued on disability leave until she voluntarily disability separated. (Doc. 15 at 18, Ex. 2).[8]

54. Brabson applied for disability retirement on November 26, 2010, citing stress caused by her involvement in inmate executions. (Doc. 15 at 18, Ex. 2).[9]

55. Brabson's disability retirement went into effect in February 2011. (Doc. 15 at 23).

57. The calls from OHSP prompted Brabson to file a discrimination charge with the EEOC and OCRC on March 31, 2010. (Doc. 15 at 49, 60, Ex. 6).

58. Brabson later dismissed the charge, obtained a Right to Sue letter, and filed the instant action on June 17, 2011. (Doc. 15, Ex. 6).

### III.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

---

[8] Plaintiff admits that she continued on disability leave until her separation, but denies that the disability for which she voluntarily disability separated was for an injury to her ankle. (Doc. 20, Ex. 1 at ¶ 41).

[9] Plaintiff admits that her involvement in inmate executions caused stress and was a factor in her application for disability retirement, but denies that the same was the sole factor in said application. (Doc. 20, Ex. 1 at ¶ 41).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS[10]

### A. Sexual Harassment

Plaintiff claims that she was the subject of sexual harassment and that SOCF failed to intervene.

#### 1. *Untimely*

To recover under Title VII, a plaintiff must first timely file a charge with the EEOC. *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001). Pursuant to 42 U.S.C. § 2000e-5(e)(1), an individual must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. Plaintiff alleges that Mr. Lewis harassed her for four or five months beginning in April 2007, but she failed to file an EEOC charge until March 2010, nearly three years later. Accordingly, the alleged harassment was clearly outside the 300 day statute of limitations.

However, Plaintiff maintains that the acts and conduct of Mr. Lewis continued past 2007, through at least December 2009, and SOCF's failure to take any action to investigate the charges continued through at least February 2010, constituting a continuing pattern for which SOCF is liable. The continuing violation theory is available

---

[10] As a general matter, the Court found that Plaintiff's memorandum *contra* lacked significant substantive analysis and supporting case law.

to remedy employment practices and policies that operate to deny employees their protected rights if the offending practice continued to be enforced during the limitations period. *Perez v. Laredo Junior College*, 706 F. 2d 731 (5th Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984).

Plaintiff cannot establish a continuing violation by proof that the alleged acts of discrimination (Mr. Lewis's harassing comments in 2007, the email investigation, and the murder for hire photograph incident), were sufficiently related. Instead, the continuing violation exception can only be utilized for discrete acts when an employee demonstrates that the employer had a longstanding policy of discrimination against the class of which the plaintiff is a member. *Sharpe v. Cureton*, 319 F.3d 259, 268 (2003). The murder photographs and email investigation are unrelated to sexual harassment, and neither establishes a longstanding policy of discrimination. Therefore, the continuing violation theory is inapplicable, and Plaintiff's sexual harassment claim is dismissed as untimely.

### 2. *Quid pro quo*

While Plaintiff mentions the term "*quid pro quo* harassment"[11] in her

---

[11] Sexual harassment is harassment that is "anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments." *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (1986). To succeed on a *quid pro quo* sexual harassment claim, Plaintiff must prove: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on her sex; (4) that either her submission to the unwelcome advances of a supervisor was an express or implied condition for receiving job benefits or her refusal to submit to the supervisor's unwelcome demands resulted in a tangible employment action (also called an adverse employment action); and (5) liability may be imputed to the employer. *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 Fed. App'x 587, 596-97 (6th Cir. 2009).

memorandum *contra*, she only alleges that Lewis, while not having final decision making authority, had influence in discipline decisions at SOCF. (Doc. 20 at 12). However, Plaintiff failed to present any evidence to indicate that Lewis was her supervisor and that the alleged unwelcome advances were an express or implied condition for receiving job benefits, or that a refusal to submit to any sexual demands resulted in a job detriment.

Therefore, Plaintiff's *quid pro quo* claim fails as a matter of law.

### 3. *Hostile work environment sexual harassment claim*

Even if Plaintiff's harassment claim were timely, it fails because she cannot demonstrate that she suffered a hostile work environment. In order to succeed on a hostile work environment sexual harassment claim, Plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the existence of employer liability. *Clark v. UPS*, 400 F.3d 341, 347 (6th Cir. 2005). Plaintiff is part of a protected class and SOCF does not contest that Mr. Lewis made unwelcomed advances or that the harassment was based on Plaintiff's sex. However, Plaintiff has failed to evidence the final two elements of her claim.

To the extent Plaintiff alleges that she endured a hostile work environment from 2007 until she left SOCF in February 10, 2010, she must demonstrate that all acts which constitute her hostile work environment claim are "part of the same unlawful employment

practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). In making this determination, the relevant inquiry is "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120. In application, courts look to determine what constitutes the "same unlawful employment practice" by considering whether the acts are similar in nature, frequency and severity. *Lybarger v. Gates*, No. 1:19cv373, 2012 U.S. Dist. LEXIS 44689, at *27-28 (N.D. Ohio Mar. 30, 2012) (no continuing violation because the events that occurred during the acceptable limitations period, which included plaintiff's performance review and her placement on telework, were "markedly different" from the alleged piano bar incident involving acts of a sexual nature, which occurred outside the limitations period).

    For example, multiple acts, only some of which are sexual in nature, will not constitute the "same unlawful employment practice" for purposes of a hostile work environment sexual harassment claim. *Kettering v. Diamond-Triumph Auto Glass, Inc.*, 24 Fed. App'x 352, 356 (6th Cir. 2001) (in establishing a continuing violation, "Kettering cannot rely on her additional allegations of harassment because those alleged incidents were not "sexual" in nature or directed to Kettering because of her gender."). Here, the events that occurred during the period between June 4, 2009 and March 31, 2010, included Plaintiff observing the murder for hire photographs and email investigation. These events were not sexual in nature or directed at Plaintiff because of her gender.

Therefore, Plaintiff's sexual harassment hostile work environment claim fails as a matter of law.

### a. "Me too" evidence

Evidence from a plaintiff's co-workers that they were also discriminated against is improper "because it is at best only slightly relevant and is always highly prejudicial to the defendant." *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 734 (S.D. Ohio 2011). As stated in *Jones*, "'me too' evidence is typically inadmissible under Rule 403 of the Federal Rules of Evidence because it prejudices the defendant by embellishing plaintiff's own evidence of alleged discrimination and typically confusing the issue of whether the plaintiff, and not others, was discriminated against." *Id*. Although there is no *per se* rule excluding "me too" or "other acts" testimony from non-parties, whether such evidence is relevant is a case-by-case determination and "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 380-81, 388, n.9 (2008).

Plaintiff's purported evidence of sexual harassment against co-workers Tonya Messer and Anita Triplett is inadmissible and therefore cannot create a genuine issue of material fact.[12] The opinions of Messer and Triplett are "subjective beliefs that are irrelevant and highly prejudicial, and not evidence of pretext." *St. Jude*, 823 F.Supp.2d at

---

[12] Messer and Triplett were corrections officers in the mail and visiting room and had no interaction with Plaintiff or her supervisor Al Lewis.

734. Even if taken as true, Messer and Triplett's allegations have no relevance to Plaintiff's claims.[13]

### b. Futility

Next, Plaintiff argues that reporting the harassment would have been futile based on her perception that Al Lewis was powerful within the institution. However, "it is unreasonable for employees to pass their own judgments – absent any supporting facts – about how effectively an employer's sexual harassment policies operate." *Idusuji v. Tenn. Dep't of Child Servs.*, 30 Fed. App'x 398, 403-404 (6th Cir. 2002) (sexual harassment claim dismissed where plaintiff did not complain because of the perception of the alleged harasser's relationship with company leaders). Plaintiff failed to produce any evidence that a complaint would not have been taken seriously. In fact, Plaintiff's supervisor encouraged her to make a report and she refused. (Doc. 15 at 72-73; Doc. 16, Ex. 2 at ¶¶ 3-4). Plaintiff ignores the fact that Mr. Lewis was not the only investigator on staff and thus any allegations against Lewis would be independently investigated. Plaintiff's assertion that a complaint would have been futile is also undermined by the fact that shortly after learning of Lewis's alleged harassment, she met with the Warden, an SOCF investigator, and the Warden's Assistant. (Doc. 15 at 45, 121).[14]

---

[13] Plaintiff also seeks to rely on an allegation that there were twenty complaints of sexual harassment at SOCF since 2004, and only four people were disciplined. (Doc. 20, Ex. B). However, there is insufficient evidence in the record to support these alleged complaints or to compare the circumstances of the complaints to the instant case.

[14] Plaintiff also argues that her harassment claim should have been fully investigated after Lewis was put on administrative leave. However, SOCF did launch an investigation, but Plaintiff did not want to participate. Moreover, there is no policy requiring SOCF to investigate an employee who no longer works at the institution.

Accordingly, Plaintiff's hostile work environment claim fails as a matter of law.

**B.     Gender Discrimination**

To establish a *prima facie* claim of gender discrimination, a plaintiff must show that she: (1) is a member of the protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008).

There is no dispute that Plaintiff is part of a protected class and that she was qualified for her position. However, Plaintiff failed to prove that she suffered an adverse employment action, that she was replaced by a person outside the protected class, or treated less favorably than a non-protected class member. In fact, Plaintiff failed to even address her claim for gender discrimination in her memorandum *contra*. Therefore, the Court finds that Plaintiff has abandoned the claim. *Jones v. Kimberly-Clark, Corp.*, No. 99-6280, 2000 U.S. App. LEXIS 30249, at *6-9 (6th Cir. 2000) ("When a plaintiff fails to respond to a motion for summary judgment, the district court may examine the facts presented and designated by the defendant in seeking summary judgment.").

Accordingly, Plaintiff's claim for gender discrimination fails as a matter of law.

**C.     Retaliation**

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she

engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999).

Plaintiff's retaliation claim is based on: (1) her husband being disciplined for sending sexual and racial material over his work e-mail; and (2) her conclusion that Lewis's file on a murder-for-hire case was an implied threat on her life.

First, Plaintiff alleges that Lewis retaliated against her after she turned over emails during the email investigation. However, that investigation did not involve Title VII allegations. *Creuser v. Bd. of Educ. of the City Sch. Dist. of Cincinnati*, 88 Fed. Appx. 813, 820-821 (6th Cir. 2003) (complaints about smoking, safety issues, and union issues are not protected under Title VII). Additionally, there is no evidence that Lewis knew about Plaintiff turning over the emails. "There can be no retaliation where the decision-maker had no knowledge of the protected activity. *Schmalz v. Northrup Grumman Corp.*, No. 3:11cv145, 2012 U.S. Dist. LEXIS 68983, at *38-39 (S.D. Ohio May 17, 2012).

Second, Nick Brabson was disciplined for using his work email to send one email that contained explicit sexual content and another email which made inappropriate racial statements about the President. (Doc. 15, Ex. 10). Mr. Brabson admitted to sending the emails and admitted that it was inappropriate. However, there is no evidence that Mr. Lewis had any say in Nick Brabson's discipline and there is no causal connection between Mr. Brabson's discipline and any allegedly protected activity. Plaintiff does not dispute

-14-

that SOCF had a legitimate business reason for disciplining Mr. Brabson. Instead, Plaintiff argues that a two-day working suspension was too severe compared to others who received a written reprimand. However, Plaintiff provided evidence that other employees were given two-day working suspensions for inappropriate use of email, supporting a finding that SOCFs treatment of Mr. Brabson was consistent. (Doc. 20, Ex. A-1). SOCF also reduced Mr. Brabson's discipline to a written reprimand as part of a settlement agreement in response to his grievance. Accordingly, there is no evidence of how Mr. Brabson's discipline constitutes a retaliatory action against Plaintiff.

Accordingly, Plaintiff's claim for retaliation fails as a matter of law.

**D.     Constructive discharge**

To demonstrate a constructive discharge, Plaintiff must show that: (1) the employer deliberately created intolerable working conditions as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit. *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). In establishing the objective nature of the constructive discharge, Plaintiff must show that "the abusive working environment became so intolerable" that [their] resignations qualified as a fitting response." *Penn State Police v. Suders*, 542 U.S. 129, 134 (2004).

Contrary to her deposition, Plaintiff alleges retaliatory treatment occurred in 2009, more than a year before she applied for disability retirement. In February 2010, Plaintiff began taking disability leave for an injury to her ankle. (Doc. 15, Ex. 1 at 11). Plaintiff continued on disability leave until she voluntarily disability separated. (*Id.* at 18, Ex. 2). She applied for disability retirement on November 26, 2010, citing stress caused by her involvement in inmate executions. (*Id.* at 19, Ex. 2). Therefore, her separation was unrelated to her claims of alleged harassment. *See., e.g., Reid v. Sears, Roebuck & Co*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [her] earlier deposition testimony.").

Plaintiff suffered no loss in pay or job duties and was never reassigned or disciplined. Further, seeing pictures on one occasion in 2009 would not cause an objectively reasonable person to disability retire more than a year after the incident happened. Finally, Mr. Brabson's discipline does not create a constructive discharge claim. Mr. Brabson was one of many employees to be disciplined for abuse of work email, and his discipline was reduced through the institution's grievance process. Even taking these incidents as true, they did not create working conditions that were so intolerable that disability retirement qualified as a fitting response.

Accordingly, Plaintiff's claim for constructive discharge fails as a matter of law.

## V. CONCLUSION

Accordingly, for the reasons stated here, there being no genuine issues of material fact being in dispute, and movant being entitled to entry of judgment as a matter of law, Defendant's motion for summary judgment (Doc. 16) is hereby **GRANTED.** The Clerk shall enter judgment accordingly, and all claims having been dismissed, this case shall be **CLOSED**.

**IT IS SO ORDERED.**

Date: 11/9/12                                         *s/ Timothy S. Black*
                                                     Timothy S. Black
                                                     United States District Judge